IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

PAMELA D. GILMORE                                                                    PLAINTIFF

v.                                          No. 5:06CV00080 SWW

MICHAEL J. ASTRUE, COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION                                      DEFENDANT

## MEMORANDUM OPINION AND ORDER

Plaintiff Pamela D. Gilmore has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI ). The parties have submitted their appeal briefs,[1] and the issues are now joined and ready for decision. The Court finds, for the reasons stated below, that the decision should be affirmed.

The Court's function on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.[2]

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. In determining whether existing evidence is substantial, we consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. As

---

[1]Gilmore's brief was filed on July 26, 2006, and the Commissioner's brief was filed on August 29, 2006.

[2]Gilmore had the burden of proving her disability by establishing a physical or mental impairment lasting at least one year that prevents her from engaging in any substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); Baker v. Apfel, 159 F.3d 1140, 1143 (8th Cir. 1998); Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

    long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.

Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (citations omitted).

    Gilmore filed an application for DIB and SSI on June 17, 2002, alleging that she became disabled on November 16, 2002,[3] due to three surgeries to the right arm, tendinitis in the right foot, carpal tunnel syndrome, ganglion cyst, torn rotator cuff, broken ankle, and her fingers, arm and wrist hurting (Tr. 62). Her claims were denied initially and upon reconsideration (Tr. 39-37, 51-52). Pursuant to Gilmore's request, a hearing was conducted by the Administrative Law Judge (ALJ) on May 26, 2004 (Tr. 306), on her claims associated with shoulder, back, and leg pain; rheumatoid arthritis; fatigue; headaches; poor sleep; swelling of the joints; numbness in the hands and feet; and chronic fatigue as well as stomach problems related to acid reflux (Tr. 26). Also present and testifying were Alucious Gilmore, Gilmore's husband, and Richard Marron, M.S., a vocational expert (VE).

    Gilmore was 39 years old on the date of the ALJ's decision[4] (Tr. 22, 308). She completed the eighth grade, can read and write, and can do simple math (Tr. 22, 311). Gilmore has past relevant work (PRW) experience as a cook, an assembler (assembling air conditioners and putting tongues in shoes), and hand packer (packing video tapes) (Tr. 28, 83-89). She is married and has four children; two of the children and a grandchild live with her (Tr. 310).

---

[3] Gilmore's counsel clarified at the May 26, 2004 hearing that the alleged onset date was 2001, and not 2002 (Tr. 308).

[4] July 26, 2005 (Tr.18).

Gilmore testified at the hearing that she had been seeing Dr. Tamer Alsebai, a rheumatologist, for nine months – approximately every three months – and that there was a history of rheumatoid arthritis in her family (Tr. 312). He diagnosed her with rheumatoid arthritis, tests her as far as pushing and pulling, and monitors her medication – currently methotrexate – although they have discussed remicade injection as a better medication, but her co-pay is too much (Tr. 312-313). Gilmore did not know why amitriptyline was substituted for hydrocone for her pain and she stated that she also takes folic acid and lotrel for high blood pressure (Tr. 313-314). She said she suffers from nausea about three times a week and headaches three or four times a week as a result of the medications (Tr. 314-315). Gilmore also testified to suffering from fatigue all the time as well as having a hard time sleeping, but ampil had not been successful in helping her sleep (Tr. 314-315).

She stated that she had surgery on a torn rotator cuff in June of 2001 and, while she tried to go back to work, she stopped in November of 2001 because she had pain in her shoulder and right arm and was missing work two or three days a week (Tr. 315-316). Turning to her rheumatoid arthritis diagnosis in October of 2003, Gilmore said that her fingers started to swell about a year ago and she has problems with both hands and wrists, both feet, both knees, both shoulders, and her back as well as having carpal tunnel in her right hand since 2000; she said the carpal tunnel makes her hand tingle and ache while the arthritis causes swelling in her joints (Tr. 316-318). She testified that she obtained no relief from the shoulder surgeries, but initially had alleviation of the pain from the carpal tunnel surgery until her return to work (Tr. 318). Gilmore stated that the pain is constant, makes it hard to concentrate, and is aggravated by cold (Tr. 318-319). She was scheduled for exploratory surgery for her stomach problems the next month separate from the acid reflux problem (Tr. 319).

Gilmore testified that she could sit without interruption for 30 minutes to an hour before her knees and ankles would swell; she could stand for 30 minutes with the same results; she could walk continuously for 30 minutes; she could lift 20 pounds overhead; she could lift 5 pounds repetitively; she would have problems bending or kneeling due to her back and knees; she has problems reaching; she sometimes has problems with scissors, using a pen, and buttoning a shirt; and she no longer drives (Tr. 319-323). She stated that her kids do the cleaning and her husband does the cooking; she reads and watches tv; she has friends come over sometimes; and still goes to church, but not every Sunday (Tr. 323-324).

Gilmore's husband testified that they had been married seven years and that she stopped working due to having pain all the time (Tr. 325). He continued that her sleep is interrupted, he massages her before bed every night, and she takes her medications as prescribed (Tr. 326).

The ALJ asked Marron a hypothetical about a woman in her middle to late 30s, eighth grade education, and past work experience from the record; she could handle weights at the light level; she could sit, stand or walk six hours out of an eight hour day; she could occasionally bend or kneel; and she could not perform repetitious hand movements. Marron testified that such an individual could perform her PRW as an assembler of small products such as packing movie videos (Tr. 328). When asked the same hypothetical with the individual handling weights at the sedentary level who could sit six hours out of an eight hour day, she could stand or walk two hours out of an eight hour day, who could occasionally bend and kneel, and with no repetitious use of the hands, Marron responded that the individual could perform Gilmore's past work as the assembler of small products packing

movie videos and DVDs (Tr. 328-329).[5] Gilmore's counsel modified the hypothetical with the ability to sit for four hours, stand for two; limitations in the ability to push, pull, and reach; ability to lift a maximum of 20 pounds and repetitively five pounds; occasional bending and kneeling; and a concentration level significantly limited because of pain, Marron testified that she could not return to her PRW and there were not any jobs in the national economy which she could perform (Tr. 329).

The ALJ found that Gilmore had not engaged in substantial gainful activity since her alleged onset date (Tr. 23). After a review of the medical evidence, he further found that Gilmore's combination of impairments associated with rheumatoid arthritis, partial suprasinatus tear and AC joint arthrosis, recurrent right carpal tunnel syndrome, and rotator cuff tear repaired could be considered "severe," but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 25, 29).

The ALJ evaluated Gilmore's subjective allegations and complaints pursuant to the criteria set forth in <u>Polaski v. Heckler</u>, 739 F. 2d 1320 (8th Cir. 1984).[6] He found the level of restricted daily activity asserted, which is total incapacity, inconsistent with the medical findings, particularly the functional capacity evaluation and the findings of Dr. Alsebai so that her limitations are on a voluntary self-imposed basis (Tr. 26). The ALJ also noted that the findings of the functional capacity evaluation indicate that Gilmore has no significant restriction on her ability to sit, stand,

---

[5] Marron explained that although the job is called assembler of small products, it is actually a packing job where Gilmore takes the objects and puts them in a box (Tr. 329).

[6] These include the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) other treatments for relief of pain; and (6) functional restrictions.

or walk and that Dr. Alsebai found that Gilmore could sit and/or stand for significant periods throughout the day (Tr. 27). In addition, he observed that there was no indication that the prescribed medication is not effective in controlling her alleged symptoms or that she suffers any negative side-effects from the medication (Tr. 27). The ALJ stated that he had also considered Gilmore's appearance and demeanor as well as the medical evidence and testimony in light of the factors and, while acknowledging that her impairments could be expected to cause some limitations, there was nothing in the record to support a finding that she was restricted to the point of being incapable of performing most basic work-related activities (Tr. 27). The ALJ noted that the testimony of Gilmore's husband appeared to be based on an uncritical acceptance of plaintiff's complaints and a desire to see her receive benefits, but the medical testimony did not support his testimony that Gilmore is unable to perform even simple household chores such as light cleaning and cooking (Tr. 27).

  The ALJ concluded that Gilmore is capable of frequently lifting 10 pounds and occasionally lifting 20 pounds; she is unlimited in her ability for sitting, is capable of standing/walking with appropriate breaks for a total of six hours in an eight hour day; she is capable of occasionally kneeling and bending; and she is restricted from performing repetitious hand movements (Tr. 27). He continued that Gilmore has retained the residual functional capacity (RFC) to perform a wide range of light work and could return to her PRW packing video tapes, as that job was previously performed by her, since her written statements regarding her job duties indicate that she was not required to do any lifting and/or carrying, she was able to alternate between sitting and standing while working, and her testimony and the VE testified that Gilmore performed her job as a hand

packer at a sedentary level of exertion (Tr. 28). Thus, he found that Gilmore was not under a disability at any time through the date of the decision (Tr. 29-30).

Gilmore argues that the ALJ failed to give proper weight to the assessment of her treating physician. She asserts that the ALJ based his finding that she retained her ability to perform her PRW as a hand packager solely on the results of the functional capacity evaluation completed by Tim Atkinson, an athletic trainer who spent a total of four hours with Gilmore. Gilmore contrasts that with Dr. Alsebai, a licensed physician practicing in the filed of rheumatology who had treated her for nine months, tested her ability to perform the very functions that were the subject of the medical assessment, and specifically stated that Gilmore could only sit or stand for a period of five hours per eight-hour workday. She points to Dr. Alsebai's documentation from numerous visits of several objective and identifiable symptoms consistent with the diagnosis of rheumatoid arthritis whereas there is no such medical evidence supporting Atkinson's evaluation.

Gilmore continues that the ALJ's failure to properly weigh Dr. Alsebai's assessment caused the VE's testimony to be inadequate to establish whether Gilmore could return to her past work as a hand packager since Marron had stated that there were no jobs in the national workforce that could be performed when the hypothetical question was changed to describe a person who could only sit or stand for four hours per eight-hour workday. She argues that Marron was not asked about a person who could only sit or stand for a period of five hours. Gilmore adds that since sedentary work generally totals approximately six hours of an eight-hour workday and the record establishes that she cannot sit for a period of more than five hours, Gilmore cannot only not return to her PRW, but cannot return to any employment environment. She states that it was the duty of the ALJ to

either credit Dr. Alsebai's assessment or to develop on the record substantial evidence contradicting Dr. Alsebai and provide the reasons for choosing to discredit it.

Gilmore claims that since the record evidence supports a finding that she cannot return to work in any capacity, the case should be remanded with instructions to grant her benefits. In the alternative, she asks that the case be remanded so that the ALJ may develop the record more fully concerning her ability to perform her PRW.

The Commissioner counters that the credible evidence of record supports the ALJ's determinations that Gilmore had the RFC for light work and could perform her PRW as a hand packager. He states that Dr. Alsebai's July 2004 RFC is not entitled to the significance Gilmore attributes to it as it is inconsistent with his own treatment notes as well as the rest of the record. The Commissioner notes that the treatment records show that Dr. Alsebai primarily saw Gilmore for problems with her hand, shoulder, and neck – which impairments have little to do with her ability to sit, stand, or walk – and that Gilmore almost exclusively sought treatment from all of her physicians only for her hands, shoulder, and neck.

He contends that while impairments involving Gilmore's back, legs and feet may have caused some limitations in walking, sitting, and standing, Gilmore stated that her problems in these areas occurred only occasionally. The Commissioner also points out that Dr. Alsebai had stopped treating Gilmore five months prior to his RFC, had not performed any recent test to objectively evaluate her current physical status, and had only treated her three times in 2003 and once in 2004 without noting significant findings consistent with the degree of limitations he assessed. He relies on Dr. Alsebai's observation that Gilmore had a stable gait and straight posture, and that she ambulated without the use of any assistive devices. Dr. Alsebai's September 2003 examinations of

the thoracic spine, lumbar spine, hips, ankles and feet showed no abnormalities, her knees were normal except for evidence of some crepitus, and she had normal pulses in all her extremities with no motor deficits, sensory deficits, or perpheral edema; a month later, no abnormalities in Gilmore's back and legs were observed. The Commissioner states that while Gilmore complained of low back pain and showed evidence of metatasalgias of both feet in December 2003 and February 2004, she denied any tingling, numbness or radiation of pain to her lower extremities and examination of her spine, hips, and knees were unremarkable with the lumbar spine x-rays revealing no significant findings.

The Commissioner addresses the other evidence in the record such as the treatment notes from other physicians: Dr. John Lytle in November of 2001 released Gilmore to work with absolutely no restrictions; three functional capacity evaluations ordered by her physicians in 2001 and 2004 all showed that she was able to work with no sitting, standing or walking restrictions; Dr. Sonya Peppers reported in February 2003 that Gilmore had no arthralgia, myalgia, stiffness, backache, joint swelling, weakness, numbness, paresthesia, or ataxia; Gilmore's physical therapists observed in June 2003 that she had an independent gait without assistative devices and was able to sit and stand normally; and her June 2003 bone scan and December 2003 lumbar spine x-rays showed no abnormalities.

The Commissioner also argues that the ALJ properly presented to the VE those limitations that he found were established by the evidence. Here, he asserts, the ALJ found Gilmore was not limited in her ability to sit and she could stand for up to six hours in an eight-hour workday and the VE testified, given that RFC, Gilmore was able to perform the duties of the hand packager job as she performed it which was at a sedentary exertional level. Hence, the Commissioner concludes that

the ALJ properly determined that Gilmore is able to return to her PRW after consideration of her RFC, her PRW, the VE's testimony, and the rest of the evidence in the record.

The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of all treating physicians and others, and claimant's own descriptions of her limitations. Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003).

> "The [social security] regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)). "We have upheld an ALJ's decision to discount a treating physician's MSS where the limitations listed on the form 'stand alone,' and were 'never mentioned in [the physician's] numerous records of treatment' nor supported by 'any objective testing or reasoning.'" Reed, 399 F.3d at 921 (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)) (alteration in Reed). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007) (quoting Hogan, 239 F.3d at 961).

Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007).

As the Commissioner has correctly pointed out, the July 29, 2004 RFC prepared by Dr. Alsebai does not provide the basis for his assessment that Gilmore can only sit for five hours or stand and/or walk for five hours (Tr. 292). Garza v. Barnhart, 397 F.3d 1087, 1088-1089 (8th Cir. 2005)(ALJ may discount treating physician's opinion if inconsistent with his own findings).

Dr. Alsebai's assessment is interesting as being just a month after he referred Gilmore to Jefferson Regional Medical Center for a functional capacity evaluation (FCE) which was performed by Tim Atkinson, a Certified Athletic Trainer and Certified FCE Evaluator, and Jackie Woolley, a Physical Staff Therapist, on June 25, 2004 (Tr. 292-294). This evaluation, which lasted four hours,

concluded that Gilmore was able to work at a medium level for an eight hour day with no restrictions for sitting, standing or walking (Tr. 292-294).

In his last examination of Gilmore on February 11, 2004, Dr. Alsebai noted that Gilmore had arthralgias, morning stiffness and some swelling in the hands and feet with some aching in her shoulders and some back pain and fatigue all the time (Tr. 239). However, his notes reflected ambulation without assistative devices, synovitis in the PIP joints, squeeze tenderness in the MCP joints, metatasalgias of both feet, and some tenderness in the paravertebral muscles in the lumbar area (Tr. 239). On December 17, 2003, Dr. Alsebai noted that she was ambulating without assistative devices, had lower back pain for two months, denied radiation of pain to the lower extremities or any tingling or numbness and stated that the pain is worse when bending or stooping (Tr. 240). There was no peripheral edema, clubbing or cyanosis in the extremities although there was active synovitis in the PIP joints of both hands and squeeze tenderness in the MCP joints bilaterally; there was no PIP synovitis (Tr. 240). Wrist, elbow, shoulder, cervical spine, thoracolumbar spine, hip and knees exams were unremarkable while there was significant metatasalgias in her ankle and feet (Tr. 240). The x-rays of the lumbar spine on December 17, 2003, showed no evidence of bony destructive process, the lumbar vertebral bodies in good alignment, the disk spaces maintained and the sacroiliac joints were unremarkable (Tr. 280). Her exams by Dr. Alsebai for September 10, 2003 and October 1, 2003 were similar to the ones outline above (Tr. 242-245). When Dr. Alsebai referred Gilmore to Dr. Virendar Verma at the Rehab and Pain Management Clinic, her report reveals electrodiagnostic evidence of mild moderate carpal tunnel syndrome right upper extremity (Tr. 230-231).

Dr. Kent Davidson of Arkansas Specialty Orthopaedics, in exams on February 10, 2003, February 17, 2003, and March 27, 2003, treated Gilmore for shoulder and neck pain (Tr. 271-274). Right shoulder and arm pain was her chief complaint when Gilmore saw Dr. Charles Pearce on May 22, 2003, which he felt could be AC joint symptoms as well as carpal tunnel symptoms (Tr. 269-270). When Dr. Pearce saw Gilmore again on June 26, 2003, his physical examination revealed that she had pain in her shoulder in various locations with no specific anatomic locations and not at the AC joint that day; she had pain with any motion, but not necessarily reproducible; probably had full passive motions; and no detection of gross motor or sensory problem even when she described pain when doing resistive motions (Tr. 267). The notes of Dr. Pearce's August 7, 2003 examination state that he is not sure why she is having the pain she describes in her neck radiating into her arm as the MRI showed perhaps a very small irregularity in the rotator cuff which he felt would not account for the pain she described (Tr. 266).

Dr. Sonya Pepper saw Gilmore on February 3, 2003, with right shoulder, neck and arm pain (Tr. 220). However, the examination revealed no arthralgia, myalgia, stiffness, backache, joint swelling or weakness (Tr. 220). On the February 17, 2003 follow-up visit, Gilmore again complained of right sided neck and shoulder pain, but there was no clubbing, cyanosis or edema of the extremities (Tr. 218).

An October 9, 2001 FCE performed by Anthony Brown, M.S. – an Exercise Physiologist and Certified FCE Evaluator – for Dr. Lytle rated Gilmore's DOL classification as medium (Tr. 185). Another evaluation performed for 3:30 hours on November 15, 2001, at the request of Dr. Lytle, determined that Gilmore was able to work at a medium physical demand level in an eight hour day

with no restrictions on sitting, standing or walking (Tr. 183-184).[7]  Dr. Lytle, on November 26, 2001, considered Gilmore's previous exam and the results on the October 9, 2001 evaluation in finding "no long-term impairment" (Tr. 189).

In his decision, the ALJ properly reviewed the medical evidence, the FCEs as requested by Gilmore's physicians, and the hearing testimony.  The Court finds the ALJ's opinion sets out the correct standards and cites the substantial evidence in the record to support his conclusions as to Gilmore's RFC.

The hypothetical question submitted to the VE was consistent with the limitations that the ALJ had found for Gilmore's RFC .  A properly phrased hypothetical question, as posed by the ALJ here, constitutes substantial evidence.  Warburton v. Apfel, 188 F. 3d 1047, 1050 (8th Cir. 1999).

"Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled."  Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000).  See also, Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).

In sum, the Court finds that there is substantial evidence to support the Commissioner's decision that plaintiff was not disabled.  Accordingly, the Commissioner's administrative decision is hereby affirmed.

IT IS SO ORDERED this 17th day of September 2007.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

[7] The evaluation was by Brown and Brandy Morrison an Occupational Staff Therapist.